**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | |
|---|---|
| JOSHUA STEVENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:20-CV-29-SNLJ |
| | ) |
| KILOLO KIJAKAZI, [1] | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The Commissioner of the Social Security Administration denied plaintiff Joshua Stevens's application for supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff now seeks judicial review [#12]. As discussed below, the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

## I.    Background

Plaintiff Stevens was born in 1981 and was 34 years old when he alleges he became disabled beginning January 1, 2016.  Plaintiff filed his applications on July 12, 2017, claiming disability due to schizophrenia, depression, post-traumatic stress disorder ("PTSD"), chronic back pain, and "severely limited mobility."

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

It is not entirely clear when plaintiff's conditions started, although it appears he was treated psychologically as a teenager.  Plaintiff began using drugs and alcohol as a teenager, too, and he left his parents' home and school at around age 16.  He later obtained his GED and took 12 credit hours in college.  Plaintiff is the oldest of five children.  He has two sons who were teenagers at the time of the hearing, but he is "forbidden" to see them by their mothers.   His father died in a car accident that plaintiff believes may have been intentional; his paternal grandfather died of suicide, and numerous family members have psychological issues.  His relationship with his family has been volatile but his general characterization is that his family members (especially his mother and brother) are supportive.  His work history has varied and includes working on oil platform in the Gulf of Mexico, washing dishes, as a nursing assistant, and managing apartments.  Plaintiff was homeless for four years until finding housing via Pathways in November 2015.  [Tr. 691.]  He stopped working in 2014 because he broke his back the first time, apparently as the result of an assault [Tr. 691].  Plaintiff says he does not drive and has not had a driver's license for 16 years, but, in 2015, plaintiff was the driver in a rollover motor vehicle accident that again broke his back and caused other injuries.  Plaintiff receives substantial public assistance for his health care and also—at least at some point—for household help: he testified that "girls" "show up" and sweep his floors, do his laundry, and sometimes cook and remind him to bathe, although this is not explained well in the record.  [*See, e.g.*, Tr. 603, 658.]  Plaintiff also lives in subsidized housing for which his psychiatrist opined that he was disabled and thus entitled to housing.

2

Plaintiff's caseworker frequently accompanied him to medical appointments, the grocery store, and/or pharmacy—usually Walmart. Plaintiff spends time on the internet and tried to learn how to make money on the internet, including by trying to create video games.  His providers state he has above-average intelligence.

Plaintiff suffers from auditory hallucinations and hears people talking who aren't there.  He has panic attacks and curls up in the fetal position to cope, usually for 30 to 90 minutes.  He has been depressed and for parts of the relevant history he had to be reminded to eat.  He is 6 feet 3 inches tall and weighed only 136 pounds at one point in early 2017 before moving back in with his mother and stepfather, where he rapidly gained weight.  After moving to his own place, he makes himself roast beef and cheese sandwiches and microwave meals.

The medical records show plaintiff suffered a traumatic brain injury in 2019 from being hit in the head with a golf club, but that incident is not discussed anywhere else in the record or by the parties.

Plaintiff's medical records in the transcript begin in 2015, around the time of plaintiff's motor vehicle accident, when he was being treated for anxiety, agoraphobia, depression, and schizophrenia. [Tr. 566, 544.] He was then taking Lexapro, Klonopin, and Invega.  He began taking narcotic pain medicine to treat his pain after the accident. In April 2016, he was seeing a primary care physician, Dr. LaGalle, for anxiety and back pain and was taking Percocet, Klonopin, Invega, Chlorzoxazone, Lexapro, and Ergocalciferol.  He was upset with the idea of tapering down his Percocet but agreed; Dr. LaGalle advised him to talk to his psychologist.  By December 2016, Dr. LaGalle had

continued prescribing Percocet and his other medications, but she implored him to see a psychiatrist to manage his mental health medications.  Dr. LaGalle reported plaintiff fired his psychiatrist, and he became agitated and walked out when she told him she was not comfortable managing Invega for schizophrenia and depression.  It appears plaintiff did not return to Dr. LaGalle.  By that time, he weighed only 140 pounds.

Plaintiff frequently saw mental health care professionals and received visits from caseworkers in 2016.  He expressed some small victories in mid-2016—going fishing, visiting the masonic lodge, [Tr. 651]—but expressed some anxiety about his son coming to visit for a weekend [Tr. 656]. He reported going to lodge meetings in early 2016 and visits with his son in mid-2016.  His providers began educating him about the dangers of mixing his medications in 2016, too. [Tr. 679-80.]  Shortly thereafter, plaintiff missed his appointment because he'd combined medications and fallen asleep.  He also reported that he'd been letting trash pile up and losing weight.  He expressed difficulty finding an attendant to help with household matters, too.  [Tr. 685.]  He reported in June that he had not had a panic attack in a couple months but still had anxiety attacks once or twice a week, and he had a difficult time opening up in therapy.  [Tr. 689.]

By the end of June 2016, plaintiff was having more trouble and was sleepy and antsy.  He stated he had not been coping, and his clothes were dirty; he did not know when he'd last done laundry or showered.  [Tr. 693-94.]  He decided to switch to a different program that would choose an attendant for him.  [*Id.*]  In August 2016, plaintiff was arrested for driving while intoxicated related to his motor vehicle accident the year before.  He also went to a lodge meeting that month.  In September, he had two panic

attacks at Walmart while picking up prescriptions, and he had a "breakdown" when he attempted to watch his son's cross country meet and hid in the woods near the end of the course.  [Tr. 741.]  He was not receptive to learning coping skills, according to his case worker.

On February 8, 2017, plaintiff met with his caseworker, who then took him to see a psychiatrist, Dr. Parsells.  Plaintiff was withdrawn and spoke too softly to understand until plaintiff became angry, at which time plaintiff's voice volume increased.  [Tr. 811.] Dr. Parsells reported that plaintiff had no contact with his children and was irritated that his primary care physician wanted him to see a psychiatrist.  He was uncooperative when Dr. Parsells suggested he might have a substance use problem.  [Tr. 805.]  Dr. Parsells said he was willing to continue seeing plaintiff if he would submit to a urinalysis, but plaintiff became angry and refused.  [Tr. 811.]  Dr. Parsells tried to explain that the drugs he took could be deadly if combined with alcohol or illegal drugs, but plaintiff angrily disagreed, left the appointment, and called the office and left a message with statistics he believed proved the doctor wrong.  [*Id.*]  Plaintiff indicated he did not care that his Supportive Community Living ("SCL") funding would be withheld if he did not comply with the doctor and program's requirements. The caseworker met again with plaintiff two days later, during which time plaintiff met his new aid.  The caseworker also observed that there was a new phone hooked up in plaintiff's apartment, which plaintiff said was for the business he was starting with a friend.  [*Id.*] The caseworker advised plaintiff he was being "discharged from services due to non-compliance" and he educated plaintiff regarding "when his SCL funding would run out due to being discharged."

5

Plaintiff presented to the ER on April 10, 2017 and reported he was hearing voices, had not been outside his home for a month, and was feeling suicidal.  [Tr. 837.] On April 11, he was transferred to a psychiatric facility in Joplin, Missouri.  He told the psychiatrist, Dr. Stangeby, that he had stopped taking his psychiatric medications about two months earlier because he thought they weren't working.  He said he'd also stopped going to his followup appointments.  [Tr. 848.]  Dr. Stangeby reported that plaintiff was thin, poorly groomed, and talked at extremely low volume.  His urine drug screen was negative, despite reports of chronic opiate prescriptions, suggestive of "medication misuse or abuse."  [Tr. 851.]  Plaintiff was discharged on April 17.  The discharge note reflected that plaintiff could not explain why he was negative for oxycodone if he had been taking it as he said.  In addition, though he had said he had not left his home for a month, it came out that he had been to the grocery store and to therapy appointments within two weeks of arriving at the facility.  The discharge summary further stated as follows:

> The patient was noted to have multiple inconsistencies in his report that appear to be manipulative in nature. He remains very focused on complaints of severe anxiety and pain, and was very focused on the medication he thought would help with these, specifically clonazepam and oxycodone. He remained laying in his hospital bed throughout this entire admission other than getting up to go to meals or to the nurses station to ask various questions or for assistance. He was completely lacking in any engagement. He did subjectively report hallucinations and historical diagnosis of schizophrenia, but largely see[med] fairly well organized, but did demonstrate features that seemed primarily maladaptive psychologically and related to personality disorder. Overall, he seemed very much invested in overall strategy of avoidance both in behaviors, laying in bed attempting to sleep through much of the day, and also pharmacological avoidance by focusing on sedatives or medications with sedating properties. He was restarted on Lexapro and Invega based on his

6

reports of previous benefit due to the significant difficulties with anxiety and avoidance strategies that seem to be causing a progressive treatment resistant state of anxiety and depression rather than actually helping him cope.  He was strongly advised to avoid the use of any sedating or controlled substances that promoted those maladaptive behaviors. On repeated attempts to interview the patient, he spoke in a very quiet voice that would force the interviewers uniformly to have to closely approach the patient, bend over and make excessive efforts while patient placed minimal effort in even communicating. This did appear to be part of his larger picture of interpersonal interactions to entice individuals into seeing the intensity of his disability and despair and helplessness and simultaneously inducing them to intentionally enable continued acting out at this dynamic. The patient was directly confronted with a need for him to play an active role in his treatment and repeatedly provided education and given recommendations to engage in some form of exposure and desensitization, both emotionally, cognitively, and behaviorally. He was observed and did not have any problem ambulating whatsoever and going to meals or going to the nurses station. He was advised that due to his continued behaviors, he was expected to have a poor prognosis and that this would very much limit the potential benefits of medication when these were used alone. He was advised due to his active effort there was likely no further benefit he would obtain from continued hospitalization and in fact continued hospitalization would likely even reinforce his maladaptive behaviors. He had been placed on safety and suicide precautions, and given comprehensive psychiatric assessment addressing psychological patterns, psychological issues. He had a B12 level checked to ensure that this was not a contributing factor. It was somewhat marginal at around 300 and just to rule this out he was given several injections of B12…. After he was aware that anticipated discharge will be taking place, he seem to be attempting to escalate reports of symptom severity and also elicit risky behaviors consistent with a suspicion of underlying personality disorder and greater degree of organization than he portrayed.

[Tr. 866-67.]  Such attempts included when he obtained paper and crayon and

wrote out

multiple statements suggestive of a bizarre delusional component.  This was distinct in his having never mentioned this or having made any effort to communicate any such type of thoughts or belief whatsoever prior to this point.  It was felt to be somewhat out of context for his overall patterns and was felt to be an attempt to extend his hospitalization.

7

[*Id.*]

Plaintiff was discharged and moved back in with his parents near Hannibal, Missouri, on April 17, 2017.  Having relocated across the state, he saw a new doctor for his back pain and had x-rays of his lumbar and thoracic spine with normal findings.  [Tr. 874, 875.]  Then he had MRIs for both, again with normal findings.  [Tr. 880, 882.]  The doctor continued plaintiff's Lexapro and Invega but appears not to have prescribed narcotic pain medicine.

Plaintiff began seeing a psychiatrist, Dr. Spalding.  He (again) wasn't interested in therapy but reported that Invega was working well.  [Tr. 897.]  The record shows he went fishing with his siblings in August 2017 and had had contact with his son as of September 2017.  He stopped using Lexapro and began Effexor with good results and no side effects; when he ran out, though, his mood worsened.  [Tr. 981.]  The caseworker agreed Effexor had been effective; plaintiff had been more engaged with family and his treatment plan.  [*Id.*]  In October, Dr. Spalding certified that plaintiff was disabled and handicapped for purposes of obtaining HUD housing [Tr. 917], and plaintiff moved out of his mother's home and into an apartment.  By November, plaintiff had gained over 30 pounds, started going to church with his mother, and wanted to rejoin the Masons.  [Tr. 985.]  Plaintiff began having trouble toward the end of the month when his Invega injection wore off, though, and then he needed to take Invega orally.  [*Id.*]  Plaintiff's anxiety had worsened since moving and starting on Valium.  [Tr. 990.]  In February 2018, plaintiff's injected Invega was increased to every three weeks, which plaintiff said was helping.  [Tr. 1001.]  By March 2018, the Invega dose was helping his paranoia, and

8

plaintiff was going to YMCA twice weekly and visiting friends and his brothers. [Tr. 1006.] His anxiety was still "elevated" but he was "trying not to let it keep him in the house." [*Id.*]

In June 2018, plaintiff reported he was not leaving his house although he denied psychotic symptoms. Dr. Spalding wrote "he complains of not being able to get out of the house but does not seem to do the things necessary to get that done. He refuses to go to group [therapy]." [Tr. 1011.] Then, in July, he said he was back in "good standing" with his Masonite Fraternity. [Tr. 1016.] In September he complained that the Invega was causing sexual side effects. [Tr. 1021.] In October, plaintiff continued to complain about sexual side effects but said he'd been "very busy of late." For example, he made a video scrapbook for his family and had turned his living room into an art gallery, apparently for a woman. [Tr. 1026.] In November, he had stopped his Effexor on his own. In January 2019, plaintiff had stopped taking his medications correctly and he was hearing voices and not going out of his house again. [Tr. 1039.] In the notes from that January 2019 visit, which reflected plaintiff had his Social Security hearing the next day, Dr. Spalding wrote that the plaintiff "needs to be on disability as much as any patient I have seen. He is unable to manage his affairs adequately on his own, much less work." [Tr. 1041.]

The ALJ held a hearing on January 15, 2017. The transcript reflects that plaintiff was very difficult to hear. He reported that the mothers of his children would not let him see the children. He eats sandwiches and microwavable food and spends time on the computer, mostly YouTube. [Tr. 53.] He said he was in good standing with his lodge

9

but had not been to any lodge in three or four years.  He didn't like leaving the house, didn't like being around people, was depressed and cried every day, and gets exhausted from panic attacks.

Plaintiff reported that his schizophrenia symptoms improved while on Invega, and that he was getting ready to go back on the injections instead of oral tablets.  Plaintiff confirmed that his symptoms were improved while on the Invega injections.  [Tr. 62.]

On March 22, 2019 the ALJ found plaintiff was not disabled.  The ALJ's decision recognized that plaintiff had the severe impairments of schizophrenia, panic disorder, personality disorder, major depressive disorder, and lumbar and thoracic degenerative disc disease, but the ALJ determined plaintiff could perform work existing in significant numbers in the national economy. On April 2, 2020, SSA's Appeals Council denied plaintiff's request for review of the ALJ's decision.  Thus, the ALJ's decision is the Commissioner's final decision.

## II.   Disability Determination—Five Steps

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

10

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d), 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(3)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i), 416.920(a)(4)(iv),

11

416.945(a)(5)(i). An RFC is "defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotations omitted); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Bladow v. Apfel*, 205 F.3d 356, 358–59 n.5 (8th Cir. 2000); 20 C.F.R. §§

404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)( v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### III.    The ALJ's Decision

At Step One, the ALJ found plaintiff met the insured status requirements through the relevant period, and he had not engaged in substantial gainful activity since the alleged onset date. At Step Two, the ALJ found plaintiff suffers from the following severe impairments:  panic disorder; schizophrenia; personality disorder; post-traumatic stress disorder ("PTSD"); and lumbar and thoracic degenerative disc disease [Tr. 24.]  At Step Three, the ALJ determined plaintiff's severe impairments did not meet or equal a listed impairment.

Next, in Step Four, the ALJ determined plaintiff's RFC.  The ALJ found that plaintiff

> has the residual functional capacity to perform light work as defined in 20 C.F.R 404.1567(b) and 416.967(b) except he can occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop; should avoid vibrations and hazards such as unprotected heights and moving mechanical parts; is able to complete simple, routine tasks with minimal changes in job duties and setting; is able to occasionally interact with supervisors and coworkers and he can tolerate no interaction with the general public.

[Tr. 26.]  The ALJ noted that the plaintiff's mental symptoms waxed and waned. "However, when the claimant's symptoms have waxed, this has either been addressed by a medication change or has been in the context of medication noncompliance."  [Tr. 28-29.].  The ALJ relied on several sources when considering plaintiff's complaints. Those sources included (1) plaintiff's treating physician regarding his "degenerative disk disease," for which the physician prescribed Percocet but noted normal examinations, (2) the MRIs from 2017, which suggested only minimal degenerative changes, (3) Dr. Cottone, the state agency psychological consultant, who opined that plaintiff could sustain an ordinary routine, interact adequately with peers and supervisors in a position with no public interaction, and sustain a normal workday and workweek without significant interference from psychological symptoms, and (4) Susan Rosamund, a state agency consultant, who opined the plaintiff could perform a less than full range of work at the light exertional levels with various restrictions.  [Tr. 29-30.]   The ALJ found Dr. Cottone's and Rosamond's opinions persuasive because they were consistent with the medical evidence of the record, self-reports, and provider observations.  [Tr. 30.]

The ALJ also considered the psychiatrist Dr. Spalding's opinion that plaintiff met the HUD definition of disability and his January 14, 2019 opinion that plaintiff "needs to be on disability as much as any patient [he had] seen."  The ALJ noted that Dr. Spalding made that statement in the context of the plaintiff's medication noncompliance, and that he did not provide suggestions of specific functional limitations that would be of assistance in forming a RFC finding.  The ALJ thus considered that opinion not-persuasive.

The ALJ concluded that although she was "not free to disregard a claimant's subjective symptoms simply because they are not supported by objective medical evidence," she "is free to disbelieve such allegations when they are inconsistent with the preponderance of the evidence of the record as a whole."  [Tr. 31.]

Based on the RFC determination, the ALJ determined plaintiff could perform his work as a laundry worker, office helper, or merchandise marker, which she classified as light, unskilled work, and for which significant jobs exist in the national economy.  The ALJ thus denied plaintiff's claim.

## IV.    Standard of Review

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is less than a preponderance of the evidence but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (alteration in original) (*quoting Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)). The Court must also consider any evidence that fairly detracts from the Commissioner's decision. *Id.* "[I]f there is substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992). In reviewing whether the ALJ's decision was supported by substantial evidence, this Court does not substitute its own judgment

for that of the ALJ—even if different conclusions could be drawn from the evidence, and even if this Court may have reached a different outcome. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

## V.    Discussion

Plaintiff argues that his case should be remanded for two reasons.

First,  plaintiff argues that the ALJ did not apply proper persuasiveness to plaintiff's treating source statements.  Plaintiff says the ALJ improperly relied on opinion evidence from the state agency reviewing doctor who never examined plaintiff nor saw the vast majority of the medical evidence in the file.  In contrast, plaintiff says, his treating psychiatrist, Dr. Spalding, opined that plaintiff was disabled for the purposes of the HUD housing form and that he needed "to be on disability as much as any patient I have seen."  With respect to the criticism that Dr. Cottone did not treat plaintiff, the regulations state that "[a] medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder."  20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v).  Although the existence of an examining relationship may help demonstrate a level of knowledge of the impairments, the regulations do not suggest that the lack of an examining relationship, as a factor in and of itself, would make an opinion less persuasive.  *See* 20 C.F.R.  §§ 404.1513a(b)(1), 416.913a(b)(1) (2017) (noting that Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation).    Further, there was little reason for the ALJ to find Dr. Spalding's statements on disability persuasive.  Those statements did not constitute medical

opinions, and the ALJ was not required to address them in her opinion.  Under the new

regulations effective March 27, 2017, a "medical opinion" is a statement from a medical

source about what an individual can still do despite his or her impairments, and includes

limitations or restrictions about the ability to perform physical, mental, sensory, and/or

environmental demands of work.  20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  A

medical opinion does not include judgments about the nature and severity of an

individual's impairments, medical history, clinical findings, diagnosis, response to

prescribed treatment, or prognosis.  13 C.F.R. §§ 404.1513(a)(3), 416.913(a)(3).  The

regulations note that statements on issues reserved to the Commissioner (such as

statements that a claimant cannot work) are "inherently neither valuable nor persuasive to

the issue of whether [a claimant is] disabled."  20 C.F.R. §§ 404.1520b(c)(1)-(3),

416.920b(c)(1)-(3) (2017).  Thus, the ALJ was not required to analyze Dr. Spalding's

statements about plaintiff's ability to work in the hearing decision.  20 C.F.R. §§

404.1520b(c), 416.920b(c) ("[W]e will not provide any analysis about how we

considered such evidence [statements on issues reserved to the Commissioner] in our

determination or decision.").

Plaintiff also suggests the ALJ wrongfully denied his request to order a

psychological consultative examination.  The agency's duty to develop the record arises

only if there is insufficient evidence to reach a determination on disability.  *See* 20

C.F.R. §§ 404.1520b(c), 416.920b(c).  Here, as shown above, plaintiff's treatment

records provide ample medical evidence to support that his mental impairments were not

disabling.  The mere fact that additional medical evidence might be helpful for the

17

decision-maker does not mean that such evidence is necessary to decide the case.  *See Clark v. Shalala*,  28 F.3d 828, 830-31 (8th Cir. 1994) ("[T]he ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record.").

Second, plaintiff argues that the ALJ did not form her RFC based on substantial evidence because, plaintiff says, she did not weigh plaintiff's testimony or his functional report and she did not consider the entire record.

This Court agrees that the ALJ's summary of the evidence does not tell the entire story of plaintiff's circumstances.  The ALJ opined that plaintiff has custody of his son one week a month.  Although that was true in June 2016, plaintiff only had sporadic contact with his son, and for much of the relevant period plaintiff was unable to see his son because of an apparent bedbug problem.  At the hearing, plaintiff said he was "forbidden" to see his sons.  The ALJ says plaintiff attended masonic lodge meetings and attended church with his mother, but the record mostly reflects that plaintiff did not regularly attend lodge meetings or church.  Although the ALJ says plaintiff went to the YMCA and Walmart, again, those visits were sporadic.  Plaintiff's caseworker sometimes said plaintiff functioned well while shopping, but plaintiff also had panic attacks in Walmart at times.  Plaintiff had a "breakdown" while attempting to watch his son at a cross-country race, and he managed it by hiding in the trees near the end of the course.

At the same time, the ALJ did not need to include all of those details to support her opinion, and, even considering that evidence that fairly detracts from the decision, it appears to this Court that the decision is supported by substantial evidence.  Ultimately,

although plaintiff endured episodes of severe mental illness, the ALJ opined that plaintiff's problems arose when he was noncompliant with his medications.  That opinion is supported.

Critically, plaintiff's entire brief focuses on plaintiff's hearing testimony and not on the plaintiff's medical records, which are extensive.[2]  The medical records also demonstrate the repeated inconsistencies in plaintiff's stories.  In 2017, he said his narcotic pain medicine had been stolen, he was starting a business with a friend that required a telephone, and he refused to submit to urine drug screenings, which resulted in being dismissed from his program.  While an inpatient in  April 2017, plaintiff told staff he had not left his house for a month, but it later came out that he had recently been to the grocery store and to a medical appointment.  Plaintiff also said he had been taking Percocet, but his urine drug screen was negative.  His inpatient records also show that, despite his propensity to lie in bed all day, he exhibited no problems "ambulating whatsoever."   In 2018, he was going to the YMCA twice weekly and visiting friends, resumed his "good standing" with the Masons, made a video scrapbook for his family, and had turned his living room into an art gallery.  He was even tapering himself off of Effexor.  Plaintiff repeatedly told his psychiatrist that the Invega was a wonderfully effective drug, and the record supports that when he used it properly, he was able to stay busy and perform well.

---

[2] The record in this case is complicated and spans over 1,000 pages despite encompassing only a few years of treatment.  The parties do not lay out the chronological facts of this case well, and the Court has spent ample time piecing together the record.

Plaintiff claims that the ALJ failed to discuss his testimony and allegations in his Function Report, but SSR 16-3p does not require the ALJ to list each of the precise limitations that plaintiff alleged.  The ALJ is required only to consider plaintiff's subjective complaints in light of the record.  *See* SSR 16-3p ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and other evidence.").  It is apparent from reading the ALJ's discussion of the evidence that she considered plaintiff's general allegations of disabling back pain and mental impairments.

Similarly, plaintiff claims that the ALJ used boilerplate language, but did not specify the reasons that she found plaintiff's complaints not entirely consistent with the record [Tr. 30].  Plaintiff ignores the detailed evidence the ALJ cited elsewhere in the decision [Tr. 27-29].

Plaintiff further claims that the ALJ cited plaintiff's reports in the treatment records (such as attending lodge meetings and going fishing) to show that plaintiff had no limitations.  In fact, the ALJ cited these instances to show that plaintiff's limitations were not as severe as he alleged, not that he had no limitations whatsoever.  The ALJ properly found that plaintiff's subjective complaints were not fully consistent with the record.  She relied on evidence that a "reasonable mind" would accept as adequate to support the conclusion that plaintiff could perform a range of light, unskilled work. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).

.

## VI.     Conclusion

This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not substitute its own judgment for that of the ALJ. *McNamara*, 590 F.3d at 610. Having found the ALJ's conclusions were supported by substantial evidence and that legal standards were correctly applied, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint (#1) is **DISMISSED with prejudice**. A separate judgment will accompany this Order.

Dated this 14th day of September, 2020.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE